At this time we will hear Vidal v. Nielsen and New York v. Trump Mr. President, may I ask you a question? Of course. I'm over here. Oh, sorry. The microphone's confused. I notice you're outnumbered. I am. This is kind of off the clock, but it's a question we've been asking this week. We're a little confused by, this is a civil case. I gather this is a civil case. And the question is, sometimes we're getting motions. It's a partial shutdown, and it's a civil case, and we can't come to New York, and we can't show up. And sometimes you just show up, and you're here, and of course you're going to argue, but can you explain to us what the theory is, how this works? I wish I could, Your Honor. I'd be reluctant to go there. I'm hoping I can do better with the answers to the other questions the panel has. This isn't one of my better ones. That's fine. You're here. Go ahead. With regard to the case, I think everybody agrees that the Department of Homeland Security was never required to adopt a DACA policy. And I believe everybody agrees that there's nothing in the law that requires the agency to maintain the policy. And when the policy was adopted in 2012, it was explicitly adopted as an exercise of enforcement discretion. It was the only basis of authority that was cited. And of course— This is really background, but it goes to the narrative. Am I correct? I mean, we've been told that the Department of Homeland Security has the capacity, the physical ability, to remove less than 4% of people who are eligible, you know, improperly documented aliens. So they have to prioritize and prioritize. That has nothing to do with the end, but that's the background. Have I stated it more or less correctly? I can't speak to the precise percentage, but yes, I think it's generally understood. It isn't as though it's either everybody goes or some people go. We all know that even assuming it would be perfect for people who aren't here legally not to be here, the government doesn't have the physical ability to accomplish that now. That's correct, Your Honor. I think that maybe there are a couple of sentences in the district court's opinion that I wanted to read with the court's permission. It's from the opinion in the supplemental appendix at page 9, just because I think that it describes sort of most concisely what happened in 2012. This is just a couple of sentences and its relationship to what's happening now. What the court says is, like the 2012 DACA memo, the rescission memo offers guidance to DHS employees as how the agency intends to exercise its discretion prospectively, and whereas the 2012 memo advises DHS staff to consider exercising prosecutorial discretion with respect to individuals meeting certain identified criteria, the DACA rescission memo directs those staff not to consider those criteria when exercising their prosecutorial discretion. I don't think it can be put better than that. The first memo said, when you're exercising your discretion, I want you to take this into account. When the policy is rescinded, it says, don't take those factors into account. That is what's happening here. This is a quintessential exercise of enforcement discretion. It was based, wasn't it, on a statement by the Attorney General of the United States that the policy was unconstitutional and unlawful? I mean, they didn't just change their mind. They were told, you can't do this. Well, I've got several different kinds of responses. And the first one is that there's controversy as to whether, I mean, we think it's clear, but the district court believed otherwise, that when Acting Secretary Duke rescinded the policy, what she said was that she was taking into account the Attorney General's views and the Fifth Circuit decision. And clearly, what is animating this is, it may well be illegal to do this, but whether or not it is, I'm looking at the Fifth Circuit decision, and predictively, there's going to be trouble, and at a minimum, there's serious doubts. And any sort of doubt on that score, I think, is removed by the subsequent Nielsen memo, which makes entirely explicit that, yes, the Secretary believes that the original DACA policy. Is that memo part of the administrative report? No, it's not, Your Honor. It came out after the district court decision in this case. It was issued in response to a request from the district court in the District of Columbia. It's obviously a matter subject to this court's notice, and we think that since it is the view of the Department of Homeland Security about the DACA policy, it should be considered by the court, as it was by the district court in the District of Columbia. What is precisely the government's position as to why the policy was rescinded in 2017? I think that Secretary Duke, Acting Secretary Duke, looked at the policy, considered the advice of the Attorney General, looked at what had happened in the Fifth Circuit, where not only DAPA but expanded DACA had been enjoined. You're explaining what she did, but what is the reason? I mean, the reasoning. What was the reasoning behind rescinding the policy? I don't know. There isn't a whole lot more reasoning stated there, but there doesn't need to be. I mean, this isn't an administrative decision in a rulemaking or an adjudication. I hear you, because you're saying it's nothing but it's a memorandum by an acting Secretary of Homeland Security, and it deals with something that is confided to her discretion. But there's something odd about your argument, because you're arguing in your papers that, and you have good reasons to argue that this is the type of agency action that can't be reviewed, because there's no standard of review to apply. And yet, at the same time, you're saying that it's okay to do this, because review was conducted in another circuit, and the government agrees with the ruling on DAPA. But if you're consistent, you wouldn't care what the ruling was on DAPA, because it's the kind of decision, just like this one, that there's no standard of review to apply. Yes, Your Honor, I'm sorry if we haven't been clear. Our position is it's not reviewable. These other considerations only come in at the point where a court thinks it is reviewable. We think that it's a decision, it's prosecutorial discretion. It couldn't be more clearly prosecutorial discretion, and there should be no further review. Everything else is just for judges who don't buy your first argument. That's basically right, Your Honor. I mean, imagine that there's never been a DACA policy adopted, and various groups or states came to the Secretary of the Department of Homeland Security and said, you should adopt this kind of forbearance policy. And the Secretary says, I don't want to. Or the Secretary says, I'm not answering you. Or the Secretary said, good idea, but I don't think that I have the authority. Nobody, I think, thinks that you could go get judicial review of that. That's not our situation, because there was a policy. That's right. But by adopting one policy of enforcement discretion, the Secretary does not box in her successor in any way that, say, a prosecutor who believes that a particular statute is unconstitutional or doesn't cover certain kinds of offenses and may say so, maybe the Attorney General issues a memo to that effect. The subsequent Attorney General is absolutely free to reject it. The government would be in a different position if it had given a different explanation or justification for rescinding. But it gave a reason that, frankly, I don't think makes sense. And so that's why we're in this situation right now. Your Honor, we think that the Supreme Court's decision in our Brotherhood of Locomotive Engineers makes clear that the fact that an agency gives a reason for an otherwise unreviewable decision does not make it reviewable. And that makes total sense. I mean, if Acting Secretary Duke had said nothing, there would be no basis to review. I mean, when the DACA policy was adopted in 2012, there's not a lot of elaborate discussion that goes on. Basically, the agency says, this is within my prosecutorial discretion, and I'm doing it. And so the Acting Secretary didn't need to say any more than that. The Acting Secretary said, I think, that DACA is unconstitutional. And aren't we in a position to judge whether that's right or wrong? Well, again, I think that it doesn't matter what she said, and that's what BLE does. It doesn't matter what she said. No, it doesn't. She didn't need to say anything. And the fact that she said that, and she didn't say that it was unconstitutional, but the fact that she said that does not make it reviewable. There are cases that say that when the government articulates a reason for doing something, and that reason doesn't make sense, then that's arbitrary and capricious conduct. Absolutely, Your Honor, but that's in the context. Why doesn't this fall into that? I mean, that's the standard APA review of reviewable decisions, and here what we have is a decision. Why does it not matter what she said then? Because if a decision is not reviewable, the whole point of the decision not being reviewable is that it's not subject to review. And if the Secretary says nothing, that's okay, just as DHS in 2012 could have said nothing if somebody said, I want you to adopt it. You're saying that the DACA memo itself did not need any support. There was power to adopt it. That was the position of the Secretary. There isn't any discussion to speak of. Oh, thank you. There wasn't much discussion. I mean, it was very short. And it was clearly stated, this is an exercise of prosecutorial discretion. It was the only justification ever given for DACA was this is enforcement discretion, and the Secretary believed that she had it. A subsequent Secretary... Is it your position that DACA itself limited the discretion of Homeland Security to decide against whom to begin removal proceedings and whether to continue those proceedings and whether to remove people? Not in individual cases. I mean, the question in both... That's preserved. In other words, there's nothing in DACA, whether it's preserved or not, whether it's enjoined or not, that interferes with the ability of this administration or any administration to designate people for removal and to remove them, subject, of course, to review of any final order of the Board of Immigration Appeals by this court. Ultimately, but as the passage from the district court that I read to the court says, there is an instruction from the Secretary to enforcement officers about criteria to take into account. So while there's nothing in the INA that specifically precludes the exercise of discretion in a particular case, the question is whether a Secretary can say for very large numbers of people on a categorical basis the different criteria are going to apply. And we think that the answer is no, but it doesn't matter whether the court agrees with that. The question is, A, whether it's reviewable, and, B, whether, assuming that it is reviewable, the Secretary had, at a minimum, a reason to think that there was substantial legal question. And as Secretary Nielsen has said, she would, even assuming that the Supreme Court were ultimately to say that DACA was permitted by the INA, she would not do it. She thinks that it is of questionable legality, at a minimum, and that this is the sort of thing that Congress should legislate rather than that it be undertaken by a member of the executive branch. And that's the position of the Department of Homeland Security. If DACA is rescinded, then that would mean that the ability of DACA participants to work legally would end, correct? That's correct. It's the, I mean, it's not a function directly of DACA, but just if you, like, antecedent regulation. I mean, yes, as a practical matter, that's correct. Let me ask you this. The district court, and let's assume for this purpose that the district court was correct, said, this order does not hold that defendants may not rescind the DACA program, even if the court ultimately finds that defendants stated rationale finding the DACA program was legally deficient. The ordinary remedy is for the court to remand the decision to DHS for reconsideration. On remand, DHS might later, in the exercise of its lawful discretion, reach the same result for a different reason. And I find it puzzling that you've been litigating all over the country, including here, for the last year, and the judge says, sure, you can do this. You just do it the right way, not the wrong way. Maybe he's wrong. Why don't you just do it the way he says? I mean, that would be one possible way of doing it. It is not the typical way of doing it when an agency... It may be entirely wrong, but it's a way of getting done what's, I don't mean wrong, I mean unusual. I mean, normally, if there's a preliminary injunction regarding an important agency policy, and we think a district court has got matters exactly wrong, our course is not to go back and do things over again. Our course is to try to go to this court or another court of appeals. You have one district court that said you were right. Then you've got a couple of other district courts that said you were wrong. If you persist in this rule, there's always going to be one district court who says you're wrong. According to you, and I'm not sure at all that you're wrong, all that would be necessary to promulgate a rescission is just to say it is hereby rescinded, and it's no statement of reasons, nothing to review. Nothing could be easier. Well, Secretary Nielsen has stated, has again, like, endorsed the Duke memo and elaborated on the Duke memo to the extent that the court believes that something more should have been done, something more has been done. My question is whether something less should be done. Whether the same memo issued without explanation would, as you are articulating it, be unreviewable, not be subject to review, and be not reviewed. I mean, again, I mean, at this point, since we know what the views of the Department of Homeland Security are, it would be somewhat ironic to take the case back and say, this time I'm doing it with no reasons. I mean, that would be odd, but the more important point is that by offering a reason, and the DLE is very clear on this, by offering a reason for what the Secretary did, that doesn't make an otherwise non-reviewable decision reviewable. ICC versus railway engineers. That's exactly right. And this is not a case in which the agency is being circumscribed by sort of like a substantive statute. There's no question. Nobody thinks that the INA, like in some respects, could mandate the Secretary to maintain DACA. This is pure prosecutorial discretion. And the fact that the Secretary, instead of saying nothing, said something, doesn't make it reviewable. And what the Secretary said was, if the court were to get there, is reasonable, and certainly under any sort of recognized danger, even assuming there's a review, it's certainly adequate in a case like this one. Isn't it true, and perhaps ironic, that there's less going on than meets the eye? That is to say, supposing we agree with you 100%, say you're right, and reverse the preliminary injunction. Two things. There are still two nationwide preliminary injunctions that are in place. So nothing happens. And second of all, this is just the preliminary injunction. The case isn't gone. It still goes back down for the decision on the merits. Isn't that so? Well, as to the first point, there certainly is another nationwide injunction with a pending petition for certiorari. As to the second point, when a district court's order rests on a clear error, just an error of law that is reviewed de novo by this court, the basis for the injunction ceases to exist. So you're saying that that may, as to that part of it, were we to reverse, that might imply a reversal on the merits, too? Absolutely. I mean, we think that the merit, I mean, the district court, the basis of the district court's injunction, we think is flat out wrong. The court shouldn't have, like, the decision wasn't subject to review. If it was subject to review, the court erred in thinking that it was unreasonable. And all of that has been confirmed by the Nielsen memo. You argue that under Section 1252G and related sections around there, that no court may hear, I mean, it includes the District of, the Eastern District of New York, that no court may hear any claim arising out of a decision by the Secretary to commence removal proceedings or to prosecute them or actually to effect removal. And that, therefore, the Eastern District, the federal courts lack jurisdiction to challenge the rescission. But doesn't Jennings, the Supreme Court case in Jennings, defeat that? Because in Jennings, the court did have power. The Supreme Court had power. Federal courts had power to make rulings on the length of detention, which certainly is closely related to those things. And my impression is the Supreme Court says it's limited, it's limited to commencement, prosecution, and removal and would not include what you were arguing. Well, I mean, to be clear, this is an independent basis for non-reviewability, but the, I mean, I think that It's not like you're walking backwards. No, Your Honor, I think, I'm just trying to make clear that the two operate independently, but I think that the point about 1252G is that, I mean, if you imagine that somebody like in, sort of the day before a proceeding was going to commence brought a collateral action to enjoin the proceeding from going forward without considering the sort of like the DACA criteria. That would be barred by 1252G. And that's what we think. Well, I mean, I understand that like this is sort of for a, I mean, but we don't think it should be a nationwide injunction. We think it should be limited to individuals. That's what you're hearing. Well, no, I mean, yeah, one of that's, I mean, we think that even for individuals it would be wrong, but if one imagined that this is just in the individual plaintiffs saying, I shouldn't be subject to a removal proceeding without consideration of the DACA criteria, then I think it's clearer why 1252G would apply. You reserved 10 minutes of rebuttal, so we will hear you then. Great. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court, Anisha Desgupta for the state plaintiffs. I'll be sharing time with counsel for the plaintiffs in Battaglia Vidal. I will address why plaintiff's claims are reviewable, why the district court's preliminary injunction was appropriate in scope, and why plaintiffs have pleaded a viable equal protection claim. Ms. Schoen, counsel for Battaglia Vidal, will address why plaintiffs have shown a likelihood of success on the merits of their APA claim. And Ms. Wacheen, also counsel for Battaglia Vidal, will address the balancing of the equities. An agency's determination that it lacks statutory authority to exercise discretion is reviewable. Doctrines and cases shielding discretionary action from review simply don't apply when the agency disavows discretion by announcing it has no discretion to exercise. The Supreme Court recognized that possibility in Cheney Footnote 4, and the D.C. Circuit and the Ninth Circuit have applied that principle in several cases. Here, defendants disavowed any discretion to continue the DACA policy by announcing that the policy was unlawful. That was a legal determination about the scope of their authority that is not committed to their discretion. And there is law outside the APA that a court can apply to consider the validity of that determination. You're saying that there is a limit to the scope of authority of the director of Homeland Security to prioritize or deprioritize the removal of particular people. That's what defendants said. Defendants asserted that they lacked authority to continue this policy. They asserted that there was a legal limit on their authority, and that's the legal determination. Your view is that there is no limit on their authority to prioritize and deprioritize. Our view is yes, but our view is that DACA is lawful for the same reasons that... I understand that, but let's get off the issue of this is lawful or unlawful. The question is, what is the power of the Secretary of Homeland Security? Let me give you an example. Let's say one Secretary of Homeland Security says, we are going to prioritize the removal of violent criminals. Another one comes in and says, well actually, it's more important to prioritize the removal of white-collar criminals because they do more damage. Or somebody else comes in and says, let's prioritize the removal of people who drive under the influence because they threaten children and everybody on the road. Why can't they make all those changes without issuing statements of reasons, and why does that get reviewed by me? Well, that's not what we have here, Your Honor. But you're saying that the Department of Homeland Security can do that. They can exercise their discretion to do that, but here what they do... And they don't have to explain why they're doing it, right? That's right, because they would be exercising their discretion. Here they said they had no discretion to exercise. They drew a conclusion about the legal scope of their authority, and Congress has made those kinds of legal determinations reviewable because it wants courts to be able to consider whether an agency does or doesn't possess authority. Can they do that now? I mean, Judge Garifas was suggesting that there is a way to do it. Could they say, look, that was all, you know, erase it. It's a former attorney general who said that, and he was wrong. We just think, as Judge Jacobson, we just think the priorities are wrong, and we're changing that priority. They can do that. Every court that has considered this has said that defendants do have discretion, but what they did here was not exercise discretion. The purpose? But they could do it. They didn't do it, but they could. They could, and it's telling that they haven't done it, and they disavowed the opportunity to do it even when specifically invited. What is it telling me? What it's telling you is that the purpose of this DACA termination memo was not to change priorities or to exercise discretion. It was to announce to the public that defendants had determined DACA was unlawful. It was to announce a legal determination, and that's what's crucial about this determination that makes it reviewable. Defendants don't want to issue a determination purely on the basis of discretion, even though they've been invited to, because they want to be able to say it's not – we don't have authority to maintain it. They want to be able to say – Well, they could say that all day long. They don't have to issue a memorandum setting forth priorities for removal. Well, what they did here was say that it was unlawful. The acting secretary based her decision on – Not that they can't change their minds now. I mean, in other words, could they go back now and say, going forward, we want to terminate the program, the policy, without giving any explanation? Every court has recognized that if they choose to issue a new decision, that new decision – You're saying they can do it, but there are reasons that have not been clearly explained to us by the government why they don't want to do it, and that's what you said. Well, the record makes evident that what they had sought to do was to explain their actions in terms of a legal determination that DACA was unlawful. Even the Nielsen memo, when trying to explain why Secretary Duke's determination was something – I hear you. I'm not sure why they should want to – No one's made clear to me why that – or even fuzzy to me why on earth they should want to do that, but it's a coherent position. The fact that the legal determination here makes a difference because that's the legal line that courts have drawn, and that's why every court to have considered an APA challenge to the defender – It sounds like you're suggesting what they want is a judicial determination that DACA is unlawful, and that's their real goal in the litigation? That's right. Is that what you're saying? That's right. They wanted to tell the public that they lacked authority to continue an overwhelmingly popular policy with far-reaching economic benefits. This is starting to get into politics. Your answer to that question is starting to get into politics. Whether it's popular or unpopular has nothing to do with the power of the Secretary of Homeland Security. So let's just keep to that. Well, it explains perhaps why defendants have repeatedly declined to exercise their discretion and take responsibility, even though they've been specifically invited to by multiple district courts at this point. In other words, when we ask you the question why, the answer is politics. That's right, Your Honor. That's right. And there are good reasons why Congress wanted to make an agency determination about legal authority reviewable. That's because the agency should not be the final arbiter of its own compliance with the law. That's the task of the courts, and that's not in any way inconsistent with BLE or Cheney. Nothing in those decisions suggests otherwise. BLE and Cheney addressed purely discretionary actions, a discretionary denial of a motion to consider, and in Cheney, an agency's exercise of its inherent discretion to decline to pursue certain enforcement actions. Defendants here never invoke their discretion at any point. At every turn, they have insisted they lacked discretion to do otherwise. That legal determination is reviewable. Defendants can take that route. If DACA is justifiable as an exercise of prosecutorial discretion and can be implemented by a memorandum from the Secretary, why can't it be undone as a matter of prosecutorial discretion by a memorandum of the Secretary? It could, and defendants remain free to do that. It could. It could. They have not withdrawn it as an act of prosecutorial discretion. They have withdrawn it based on a legal determination that they lacked discretion in the first place. So this is not a situation where an agency is— There was a Fifth Circuit case, the DAPA, not DACA, but the DAPA case, which was held to be unconstitutional. The Fifth Circuit— And this is—I don't think it's a perfect analogy, but it's an analogy. And why shouldn't the government—why shouldn't the executive branch be able to make its own determination as to what it considers a proper exercise of the Constitution? I mean, every branch of government can determine for itself whether it wants to take an action that it considers to be unconstitutional. Two points here. First, the Fifth Circuit never reached the constitutional claims there. So A.G. Sessions' claim that they did was wrong. And second, of course, the defendants remain free to set their own enforcement priorities. And if that is all they had done here, we would have an unreviewable act of discretion. But they did not simply set enforcement priorities. They set forth a determination about the scope of their authority that would be binding on the agency. They said it was inconsistent with the INA. They said it was unlawful. And what that means is that— But not unconstitutional. The reason—well, A.G. Sessions said it was unlawful. No, no, no, no. I'm asking about—we're on the Fifth Circuit. Yeah. That's right. The Fifth Circuit did not say anything about the constitutional claims. But it did about its legality under the INA. The Fifth Circuit suggested that DAPA and likely DAPA would not be individualized acts of case-by-case discretion. Did they say it, or did they suggest it? They said that there was evidence that had been presented in the district court on a preliminary basis that suggested that. So the DACA memo specifically says it's to be an exercise of individualized discretion. They said there was some evidence that suggested it wasn't. We now know, based on information in the public record, that was wrong, and defendants knew that all along. Is it still the case that no court has jurisdiction to hear a cause or claim on behalf of any alien arising from the decision or action by the attorney general to commence proceedings or to prosecute proceedings or to effect—execute removal orders? That's right, but that's not the suit, Your Honor. We are just— So the—I'm just trying to see what there is here, because I'm sort of inclined to agree with Judge Zack's comment that there may be a lot less here than meets the eye. Because it looks as though DACA doesn't restrict the ability of the attorney general and presumably the homeland security to designate who will be removed. Well, yes, that's why the INA's— And the only review is in this court after a final order of the BIA. Well, no, the fact that DACA is not a defense to removal is the reason why the INA is not a bar to justiciability of these claims. As every court that's considered these INA bar arguments is concluded— Well, I mean, look, and let's be candid. Every court is referring to several courts, and these cases are pending around the country. And, you know, with 100,000 possible plaintiffs, judge shopping gets very easy. With 100,000 possible plaintiffs, you can become a shopaholic. So the fact that any number of judges have said a thing because these cases were brought to them doesn't really short-circuit the analysis that is justified. Well, the Supreme Court has made very clear that that language in 1252G applies only to those three discrete acts. That's right. And neither the DAPA policy nor the termination of the DAPA policy is one of those discrete acts because DAPA was never a defense to removal. And so nothing in litigation about the legal determination about the legality of the DAPA policy could possibly interfere with the removal of any— Neither the DAPA nor DACA nor the rescission thereof could be raised to defeat a final order of the Board of Immigration Appeals. That's right, and that's why it's not a bar. That's sort of why I'm wondering sort of what there is here. What there is here, I take it then, is simply what an agent should consider when deciding whether to—should consider, but not bound in considering, what persons to designate for removal. It allowed people to get certain important benefits like work authorization under collateral federal regulations without waiting to be put into removal proceedings. Social security numbers and a whole bunch of—actually a whole bunch of other things. Right, and it's those— on an individual basis who should be removed. That's right, Your Honor. That's why defendants' arguments about this cabinet and their discretion are wrong. I see my time is expiring, so I do want to move on. Don't worry about that. There are going to be plenty of questions. Okay, okay. Well, I want to say that the bottom line on APA reviewability is that— The red light here means caution. Okay. Thank you, Your Honor. The bottom line on APA reviewability is that an agency can't say that the law ties its hands and then prevent a court from untying them. And that's what the Supreme Court's cases say. That's what—that's the line that courts have drawn. When an agency invokes the law as a reason for its action and says it doesn't have discretion, it is neither exercising discretion within the meaning of committed to agency discretion by law, nor is it, in fact, doing something in a realm where there is no law to apply. So the two things that need to be satisfied for review under 701A2 are satisfied. You said you were going to talk about the scope of the injunction. That's right, but— What's at issue here about that? I mean, if an injunction is appropriate, I'm not sure— I don't understand what the issue is relative to the scope. That's great, Your Honor, because we believe that the scope of the preliminary injunction, which defendants have attacked as overbroad, was clearly within the scope of a district court's discretion because the district court tethered the scope of the injunction very carefully to findings in the record about the nature of the harms and the impossibility of crafting a narrower injunction that would be sufficiently protective or administrable. The notion of its being nationwide, though, is troubling to me because— and I can understand why—the argument that it has to be, but the notion of having different—you know, the Fifth Circuit and the Second Circuit and the Ninth Circuit could each have an injunction that covers the entire territory of the United States, and that's inconsistent, I suppose. I mean, one answer, I suppose, is that's what the Supreme Court is for, but it is troubling. But Judge Gerefis wrestled very carefully with this question. He wrestled carefully with the question of whether there was any possible narrower injunction that would adequately protect 16 states, the District of Columbia, and organizational plaintiffs, and he concluded that based largely on the nature of the harms showed, there was no way to do that because the state plaintiffs here showed irreparable harms to, among other things, their interests in their capacity as employers and operators of universities, and they recruit nationwide. And Judge Gerefis determined, based on the evidence that was presented to him, that it was impossible to craft an injunction that was limited only to current residents of the states, current students, current employees, because you could have an individual who the states have sunk a lot of resources into recruiting for a unique position, and if that person's DACA expires before they become an actual enrolled student or actual employee, the state would be disrupted and would lose money. And so the only way, in light of the number of people who would have to be covered, was an injunction of the scope. We have, within the plaintiff group, we're talking about over 2,000 people that would need to be covered under even the narrow injunction the defendants proposed. And Judge Gerefis very reasonably concluded that a person-by-person injunction directed at such a large number of people would be impossible. It wouldn't actually protect the states against all the harm that they've showed that they would suffer, and it would not be possible to administer, and that was within his authority, his equitable authority. He didn't abuse his discretion. Defendants haven't explained or demonstrated that any narrower injunction would be sufficiently protective or workable, and so this is not a case where a district court judge just entered a nationwide injunction based on a thin showing of harm by a single plaintiff. It's very different. The idea of nationwide injunctions is complex and probably insoluble by anybody other than the Supreme Court. But you have to concede that if you start 10 lawsuits and any single judge can have a nationwide injunction, it's like buying up all the raffle tickets. You're going to win. It's a tricky issue, but fortunately the court does not need to confront it here, also because the Battaglia Vidal plaintiffs had moved for class certification, and the district court denied that motion as moot without prejudice to renew when it concluded that it needed to issue this injunction If the court has any questions or doubts, there's still that motion. But the states have adequately demonstrated the need for this. It was proper. And so... The other thing we haven't talked about because it's none of our business, but to paraphrase the First Amendment, Congress can make a law, and that would put us in a completely different situation and make all of this signify nothing. That's right. This is just preliminary relief because, among other things, we still haven't gotten the administrative record in this case. So it's not possible for any court to consider the merits of the APA claim, and what the district court determined was that the harms that were threatened by this were so vast and irreparable that before the courts could adjudicate the merits, at least some interim relief had to be provided. The court, even though it ordered the entire administrative record, never got the entire administrative record. We have still not received the administrative record. All of defendants' obligations to produce the administrative record or any discovery have been stayed since October 2017, and they have not provided anything. So this... What we're doing here is dealing with an injunction that is preliminary and duplicative and on a field that's interlocutory. Thank you. I just want to very briefly address the reasons why the district court correctly declined to dismiss plaintiff's equal protection claim, and that's because we've adequately alleged sufficient circumstantial evidence that supports an inference that the termination was at least partly motivated by animus against the Latinos. We alleged a number of facts and statements which, taken together, raise a plausible inference of invidious discrimination. For example, we alleged facts showing that defendants changed their public stance on DACA abruptly, that the reasons they gave were riddled with errors. For example, A.G. Sessions' letter wrongly claiming that courts had found policies like DACA unconstitutional. We now also know from information in the public record that although the acting secretary's termination memo said she was unable to identify any discretionary denials of DACA, defendants did have that evidence in their possession. And as the Ninth Circuit observed in the Regents' case, defendants' abrupt change of position and... What do you mean by a discretionary denial of DACA? That in the memo, Secretary Duke says that although the DACA memorandum contemplated that this would be individualized case-by-case decision-making, she had been unable to find any instance of a person who met the criteria for DACA and yet was denied. Didn't I read somewhere that there were thousands of such denials? That's right. In a recent Southern District of Texas action, defendants produced discoveries showing that up to 20 percent of applications in some areas are subject to discretionary denials. And they had that information in their possession all along when Secretary Duke made those representations in the memo. As the Ninth Circuit observed in Regents', this abrupt change of position and error-filled process shows that the decision was made without the kind of care and consideration that would ordinarily characterize a decision of this economic and social significance. And that raises a plausible inference that negative attitudes towards Latinos at least partly motivated defendants' actions, and that inference is sharpened by negative statements that the President has made about Latinos and the fact that the adverse effect... You're talking about that, aren't we? Is my understanding correct that we're largely talking about pre-election statements and not post-election statements, or is that incorrect? No, our complaint alleges a number of post-election statements, and the supplemental brief also references a number of more recent statements that are judicially noticeable. We have lots of briefs. That's right. Thank you, and we'll now hear from Counsel Ford Vidal. Good morning. Good morning. May it please the Court, Hannah Schoen on behalf of the Bataya Vidal plaintiffs. I would like to introduce Martine Bataya Vidal and Eliana Fernandez, two of our plaintiffs who are in court today. Defendants' termination of the DACA program was arbitrary and capricious because defendants failed to adequately explain their legal conclusions. In the Duke Memorandum and the Sessions Letter on which it relies, defendants made conclusory statements asserting that DACA was unconstitutional and unlawful, yet defendants never adequately explained why this was so. Defendants never attempted to explain why DACA was unconstitutional. In fact... Was there an obligation to explain? What if they had said nothing and just announced the decision? No, that would not be sufficient either because, as I'll explain, the defendants had to also, because this was a reversal in policy, under Encino Motor Cars, defendants had to consider the reliance interests and explain that they had considered those interests. That does seem to run counter to your colleague who spoke to us about 10 minutes ago and said that all they have to do is go back to the drawing board and issue something that does not contain these erroneous statements. And you're saying even if they go back to the drawing board and issue something that does not contain statements that you view as erroneous, it still wouldn't work. They do have to, under Encino Motor Cars, they are under the obligation to consider reliance interests, especially with... So you agree with what I'm saying? Yes, because they, because... There's nothing, basically, there's nothing they can do. No, if they consider reliance interests, they certainly, we are not taking the position that they cannot rescind this program. They have to consider reliance interests, but the DACA memorandum itself says that it creates no rights. So you're saying it creates a reliance, it creates a right that's based upon reliance. The plaintiffs and hundreds of thousands of other individuals who are DACA recipients participated in this program and relied on this program. Yes, the government did say that they were... The memo laid out a winding down procedure. Doesn't that suggest that they took into account reliance interests because they came up with ways to try and address that? No, it doesn't, because actually in Attorney General Sessions' letter, he explains that this is for the convenience of the Department of Homeland Security. Furthermore, this sort of implicit consideration still wouldn't meet the agency's burden under Encino Motor Cars. The agency still has to explain that it has considered the policy consequences, which are not only to DACA recipients, but also to their workplaces, their schools. They're also, as you can see in the amicus briefs in this case, for example, there's an amicus brief from 113 businesses that employ DACA recipients. The economy would lose more than $350 billion. Defendants also never considered the impact of the DACA termination on cooperation with law enforcement, which is also explained in the amicus brief from law enforcement leaders. And so none of these impacts that are massive impacts were considered by defendants whatsoever. And so that is a clear reason why the termination was arbitrary and capricious under the framework in Encino Motor Cars, which is the frame to look to in this case, given that it's a reversal in policy and not writing on a clean slate. Well, let me give you the hypothetical of one secretary and attorney general says, we're going to prioritize violent offenders, and there are so many of them, hypothetically, that that's all we're going to do. And the next person to take office says, well, we're going to actually we're going to add white-collar criminals because they undermine our financial system on which everyone relies. Can they do that? That might upset the reliance interests of white-collar criminals who may have pled guilty without understanding that that could make themselves vulnerable to removal. They can do that. However, we're just making a procedural point that in this case where you have reliance interests and individuals who very reasonably relied on this program, the government told them to come out of the shadows and to participate in DACA. Even President Trump himself told DACA recipients like our clients and like many others that he would take care of them and deal with this with heart. And yet, there's nothing in DACA or in the rescission that affects the ability of Homeland Security to designate anyone who is removable for removal. The DACA program is unique in the sense because it did instead of a mere prosecutorial discretion like an individualized decision, here we have a program that told people that they could participate and they could get these benefits. And so, you don't have a sort of individualized determination. You rather have an extremely large policy that individuals... Was there a time limit set on it? There was no time limit set in the original memorandum. They were told that they would have to renew every two years. And so, many DACA recipients have renewed two, three times now and have... If they're told they have to renew every two years, is that not implicitly, if not explicitly, an instruction that it could end in two years? It could end at any time? It's not an implicit instruction to that effect. It instead is... Certainly, DACA recipients understood that the program could end at any time. And as I said, we're certainly not disputing that the Secretary has the authority to end the program. The problem here is how the Secretary did it, both in terms of not considering these huge policy impacts that are just completely absent from the Duke Memorandum, but also because this legal reasoning was not adequately justified. So, I want to return to that point, and specifically the Texas decision. And the problem here, as Judge Bates recognized, is that the Texas decision is... First of all, it's about a different Deferred Action Program. It's about the DACA program. And this addresses a different population from the DACA program. But furthermore, the reasoning... It's an exercise of prosecutorial discretion. The DACA program, yes, but there were... So, the Fifth Circuit... I'm sorry, you may not know this because it's a different case, but did the DACA program create an ability to work, to get working papers? Yes, that's correct, because that's all by administrative regulation. If you receive deferred action through DAPA, DACA, whatever, you get work authorization by regulation. Is that something that is bestowed on anybody who is the subject of deferred action? Yes, yes, and that's a longstanding DHS policy. Additionally, so in Texas, the reasoning also was erroneous because the Fifth Circuit conflated lawful presence and lawful status. And so DACA, these deferred action programs, by administrative regulation also confer lawful presence. However, they never confer lawful status. And so there's no conflict with the INA, which is solely devoted to looking at lawful status. And so... What is the status? Sorry? What is the status? If it's not a status, then what is a status? So a status is a specifically enumerated immigrant or nonimmigrant visa in the INA. Ah, well, if it's... Yeah, but I think when it's said that it creates a new status, it's saying it creates a status outside the INA and therefore an illegal one. The other issue is that... You have the ability to remain in the United States under certain terms and conditions and with certain opportunities and benefits. That seems to be what a status is. The issue here is that DACA recipients, as was mentioned by my colleague, also do not have the ability... It's not a defense to removal, in addition. And so that's the difference. If you have a status, then you're not going to be removed from the country. So those are the clear... And DACA doesn't create a status because it doesn't protect people from being removed. That is correct, yes. And that's why... So all DACA does is it just says, these people are not going to be... You know, we're going to deprioritize these people and we're going to, by administrative regulation, give lawful presence and work authorization, social security, et cetera. And so that is why the Fifth Circuit reasoning was mistaken. And more problematically, defendants realized this. Defendants went to the Supreme Court in 2016 and they argued that this was the case. And yet here they are in 2017 saying that Texas... They're just citing to Texas as if it's completely persuasive to them and as if it is applicable to this Deferred Action Program, which is distinct meaningfully from the DAPA program that was at issue in Texas. And so... It's sort of a contradiction. I think you're right. It's just that your adversary has said it's an alternative argument. It's not a contradiction.  why it was relying on Texas or why Texas allows them to come to the conclusion that DACA is unlawful. With the conclusion that DACA is unconstitutional, there's no justification because Texas didn't even reach that question. With the conclusion that DACA is unlawful, we have a gap here because Texas stands for the proposition... Even if the Fifth Circuit were right, Texas stands for the proposition  but it does not stand for the proposition that the DACA program therefore conflicts. They're analogs, aren't they? No, there's an important difference because the Fifth Circuit relies on the fact that in its reasoning that DAPA was for parents of U.S. citizens and this is a population that the INA provides for in, for example... They have other roots. Yes, exactly. Whereas DACA recipients... Your DACA recipients do not. We think that that reasoning is flawed, of course, but even if you were to be persuaded by that, that does not apply to the DACA program. And so there's no reason why the government can just cite Texas as if it actually applies to this program or as if that explains why DACA is unlawful. It doesn't. It explains at most why DACA is unlawful. I see that my red light has been on. Has been on. Is there a subject you have not touched on that you wish to argue? No, I don't believe so. Thank you very much. Thank you. We'll hear the other counsel for a bit. Good morning. Good morning, Your Honors. May it please the Court, Mariel Quachin with the National Immigration Law Center on behalf of the Battalion of Adult Plaintiffs. Your Honors, I want to step back to discuss the heart of this injunction, the equitable factors. Balancing the imminent irreparable harms that plaintiffs would have faced without this injunction against the government's interest in initiating a termination of their DACA rescission could not weigh more in favor of injunctive relief. On one side of the balance, defendants do not dispute that by ending DACA, they created significant harm on hundreds of thousands of DACA recipients, their communities, their employers, and their relatives. Since 2012, DACA provided hundreds of thousands of DACA recipients with two-year protection from deportation, authorized them to work. How many are there, by the way, who are enlisted in the program? There are nearly 800,000 individuals. As of now? No, not as of now. Since the injunctions were issued, there are about 691,000 individuals. Is that because people can't renew? Those are the individuals who have been able to continue renewing under the existing injunctions. Thank you. I'm sorry. No, no problem. Yet defendants' decision to end DACA on September 5th threatened to throw the lives of these individuals into turmoil. Without this injunction, for example, Plaintiff Eliana Fernandez, who is here with us today, would have lost her employer-sponsored health care coverage for both her and her two young U.S. citizen children. She also would have been able to continue making payments for the family home that she purchased because of DACA. Similarly, Plaintiff Martine Batalla-Vidal, who is also here. I'm not sure I was under the impression from your colleagues that the problem here was procedure, and that is that accepting everything you say is both true and assuming it to be tragic. Still, the government could do it if they did it the right way, that your colleagues seem to think. Correct, Your Honor. Plaintiffs do not argue that the government cannot end DACA. They simply argue that the way in which DACA was terminated was based in an arbitrary and capricious manner that violates the APA statutory requirements. You're saying that they didn't have to keep it in place, but they were required to take into account as part of their reasoning the injury it would do to DACA recipients. Is that what you're saying? Yes. The government was required to consider these interests that were created through the DACA program. Defendants have continued to implement DACA. Is this what's referred to as reliance interests, or is that something else? These are the reliance interests that Antenna Motor Cars recognizes as being engendered through this program, which defendants have continued to implement since 2012 and which do not prevent individuals from continuing to apply for. Because of this program being in effect, our plaintiffs and the thousands of other DACA recipients could have lost their opportunities to continue financing their education, pursuing their careers, and supporting their relatives in the U.S., whether they're U.S. citizen children, relatives, or other siblings. In stark contrast, the government's interest in initiating the wind-down, according to their timeline, is not supported by neither the public nor... Suppose you classified the government's interest as preserving its statutory discretion to prioritize or deprioritize a removal of different people. Your Honor, this injunction does not intrude upon the government's discretion to do so. They can continue to revoke an individual's deferred action for changed factual circumstances after the grant, wherever they believe that that is necessary. This injunction only... That would mean changed circumstances to not allow renewal. That would apply to an individual's grant of a deferred action. So they can continue to exercise their enforcement discretion and, for example, revoke an individual's DACA who has been granted. They could also change DACA through a permissible... Even without revoking DACA, they could commence removal proceedings. That is correct. As their lawful authority for them to set immigration enforcement policies. But because the DACA termination was rooted not in their discretion or an immigration enforcement priority, it was rooted in a flawed assessment regarding the legality of DACA, this injunction does not intrude upon their otherwise permissible ways to change and set immigration enforcement policies. Here, the government's interest in ending DACA simply just is not as compelling as the significant harm that would have been imposed on the hundreds of thousands of DACA recipients. These are individuals who are Americans and all but status. We respectfully ask you to affirm the lower court's injunction and preserve this ruling. Thank you, Your Honors. We'll hear Rebecca. The outset asked a question because it was raised by your adversaries, and that is, is it true that the full administrative record has not been presented to the court? The answer to that is we believe it certainly has been. Our good friends have taken issue with that. That was the subject of mandamus petitions to this court and in the California litigation. In this court? I mean, what happened? The district court originally said that the administrative record that was submitted was not, in the court's view, the full administrative record and issued requirements that we were supposed to meet in producing additional documents. After a mandamus petition went up to the Supreme Court in the Ninth Circuit case, and the Supreme Court sort of cautioned it would be wise to address the merits before dealing with asking for expanded records, the district court here spayed the orders expanding the record. We think that the record, such as it exists... Has there been information produced in the other cases that has not been produced in this case? In particular, the information regarding the 20% of denials? I'm sorry, I just don't know the answer to that, but again... You don't know whether that should be part of the administrative record? I certainly think it should not be part of the administrative record. There is nothing, I mean, beside it here as being relevant to an equal protection statute. Well, but if the decision says it's automatic, but there's information that contradicts that, you would think that that should be part of the record. No, Your Honor, again, this is what this hinges on. I mean, that really was not the basis for the Duke memorandum. It certainly is not the basis for the subsequent Nielsen memorandum. I don't understand what that statistic, which was offered in connection with an equal protection challenge, has to do with equal protection, but the point here is that this is an exercise of prosecutorial discretion. You don't compile administrative records. I think I was on the panel that dealt with the mandamus petition. I think more than one of us may have been, and I think that the better part of wisdom that emerged from that was that before we get into those kinds of disputes, let's find out if there's a jurisdiction, and let's find out whether it states a claim, and then afterward, if you lose on all of that, you can fight all day long with all of them. I think that's right, and it's what the Supreme Court suggested also, and that's how we're here now, and so I'd just like to sort of deal, obviously, with any questions the court has, but just sort of various statements that were made. First, in Cheney, the fact that an agency has a view about the limits of its enforcement discretion does not mean that there is review. In Cheney itself, FDA said, we don't have enforcement discretion. It also said we don't want to do it, even if we have the authority, but the fact that FDA thought it didn't have authority was not sufficient to in any way make that reviewable, and then BLE, which comes later, specifically says that the fact that an agency expresses a view in the course of a legal view in the course of issuing an otherwise non-reviewable decision does not make it reviewable. That's your ICC argument that you made before. Well, that's the BLE argument, yeah, the Brothers of Brotherhood of Locomotive, yeah. It's hard for me to keep track of the acronyms, and again, remember, had this all happened originally before any document, and groups had gone to the secretary and said, it would be a good idea to do this, and the secretary said, I don't think I have the authority, nobody thinks that could have given rise to an action for review. At one point, the council suggested that the court should review for compliance with the law. That's exactly what we don't have here, is an action to seek review of compliance with the law. Nobody claims that the law requires this program. It's very different when you have an action. You're claiming a right not to comply with the law, if I understand it. You're saying that there's a protected exercise of discretion that has been exercised. That's right. So that's why I would think the characterization of asking this court to ensure that the agency complies with the law, as it would if there were an allegation that we were acting outside the scope of the statute, that that analogy is entirely an opposite, and your honor's characterization is entirely correct. Just some other things, I'd note that the Fifth Circuit in Texas was not just DACA, it was also extended DACA, and so... Well, that's because DACA itself extended, I think, the age of DACA eligibility. Yeah, there were two... And the length of time between registration. Yeah, there were two, but there was a distinct DACA component to it, and so my only point is that the Fifth Circuit's decision cast no light on that court's view of DACA, I think, is incorrect. On the equal protection, counsel says that there's been enough to create a plausible inference of a negative attitude. Now, that is not a standard that I believe can be found anywhere in determining and reviewing the exercise of prosecutorial discretion. What would the standard be? Well, I believe that the standard cited in Armstrong is clear evidence, and AADC makes clear that in the immigration context in particular, the standard is extremely high, and the idea that you can go and proceed to get discovery on the basis of a plausible inference, which we don't think exists, but even if you thought you had a plausible inference, that would not be enough to survive a sort of motion to dismiss, and that's all that counsel can even claim for it. And, I mean, that's entirely right. There's been no suggestion that either Secretary Duke or Secretary Nielsen has any discriminatory animus. Just referring to, like, the consideration of reliance interests and heavily reliance on Encino. Encino involves the interpretation of a substantive statute that had been around for 30 years, and did the statute itself allow you to come, bring you within a provision of the FLSA? So substantive law is being interpreted, but here it's an exercise, just pure and simple, of prosecutorial discretion, and, again, I just sort of come back to the point of, if you imagine that one prosecutor, one attorney general says, I'm not going to prosecute certain kinds of crimes, either for policy reasons or because he believes that the statute is unconstitutional or because certain kinds of offenses wouldn't fall within the terms of the statute, and then successor comes to a different view, nobody thinks you can review that. That's prosecutorial discretion. That's all that we have here, and the fact that it's prosecutorial discretion in the immigration area, the same in its scope as in the criminal area? I think absolutely, because as the Supreme Court recognized in A, B, C, and elsewhere, the considerations that go, I mean, the issue there was whether there had been selective enforcement based on First Amendment violations, and plaintiffs in that case were saying that because of the, sort of, by being channeled into the 1252G scheme, they had no opportunity to develop a record, and the Supreme Court says, look, in the immigration context in particular, the extent to which we will not go behind, sort of, what the views of the agency undertaking enforcement action, this is at its highest level of deference and non-reviewability, so that's exactly what we have here. Are there instances in which the Attorney General of the U.S. or the Attorney General of a state promulgates standards for prosecutorial discretion? Yes. I mean, that's definitely the case, and it's also the case that the next Attorney General rescinds that memo, and nobody's ever thought that this could give rise to any kind of review, even if persons had relied on one sort of kind of prosecutorial discretion. That's not an argument that you can raise. If an Attorney General were to say, we're not going to prosecute, at least for now, this kind of offense, that really doesn't confer affirmative benefits on people who are not prosecuted, whereas here, you have the right to work, you have a Social Security card, you have parole to leave the country and come back. These are not small things. I mean, they follow, but remember, if the Attorney General is not prosecuting, say, certain kinds of drug offenses, persons may have... I don't know how to pick that. In the meantime, we see people engaging in a trade that they might not otherwise have engaged in, or if the Attorney General of the state, local prosecutor, says, I'm not going to prosecute certain... There's a very strict standard of the law dealing with identic conditions or anything, and then everybody relies on it, and then the next person goes, I'm outraged that this is being permitted. No one gives you a right of reliance or anything else. The prosecutor clearly can change his mind, and there's not a case in the world that says to the contrary. Thank you. Thank you very much, Your Honors. Thank you all. We will reserve decision. At this time, we will take a 10-minute recess so that cameras can be carried away. Thank you.